UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SMOKEY POINT COMMERCIAL, LLC, <br><br> Plaintiff, <br><br> v. <br><br> DICK'S SPORTING GOODS, INC., <br><br> Defendant. | CASE NO. C17-1015JLR <br><br> ORDER DENYING MOTION TO DISMISS |

## I. INTRODUCTION

Before the court is Defendant Dick's Sporting Goods, Inc.'s ("DSG") motion to dismiss Plaintiff Smokey Point Commercial, LLC's ("Smokey Point") amended complaint. (MTD (Dkt. # 15).) The court has considered the parties' submissions in support of and in opposition to the motion to dismiss, the relevant portions of the record,

//

//

and the applicable law. Being fully advised,[1] the court DENIES DSG's motion to dismiss.

## II. BACKGROUND

This case arises from a commercial lease agreement between Smokey Point—the landlord—and DSG—the tenant. (*See generally* FAC (Dkt. # 11).) On December 19, 2014, the two entities entered into a lease agreement for retail space in the Smokey Point Market Place ("the Shopping Center") located in Marysville, Washington. (*Id.* ¶ 6; *see also* Compl. (Dkt. # 1-1), Ex. 1 ("Lease") § 1.1.) The Shopping Center was visually mapped out on a Lease Plan, which was attached to the lease agreement as Exhibit A. (*See* Thoreson Decl. (Dkt. # 21) ¶ 2, Ex. A. ("Lease Plan"); *see also* MTD at Ex. A.)[2] There are two areas of the Shopping Center, designated Phase I and Phase II, each of which consists of several buildings that would be occupied by various retail tenants. (*See id.*)

Both parties agree that the lease agreement controls their rights and obligations with regard to DSG's tenancy, and this case focuses on whether the parties adhered to the terms of this lease agreement in their subsequent conduct. (FAC ¶ 7; *see* MTD at 4.) The

//

---

[1] Smokey Point requests oral argument, but the court finds that oral argument would not be helpful to its disposition of the motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

[2] The lease agreement incorporated this Lease Plan and all other exhibits by reference. (Lease § 1.1, 17.24.) However, the Lease Plan was not attached to the complaint. (*See generally* Compl.; FAC.) The court will nevertheless consider the Lease Plan and all other exhibits because (1) the complaint refers to them; (2) they are central to Smokey Point's claim; and (3) no party disputes their authenticity. *See United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011).

court first details the relevant provisions of the lease agreement and then summarizes the parties' conduct afterwards.

**A.     The Lease Agreement**

The lease agreement between Smokey Point and DSG indicated that DSG would occupy a space of approximately 45,000 square feet in Building A of Phase I.  (*See* Lease § 1.1; Lease Plan.)  Party City and Ulta Beauty would occupy Building B adjacent to DSG, with Party City occupying roughly 15,900 square feet and Ulta Beauty occupying roughly 15,000 square feet.  (Lease Plan.)  Fitness Evolution was designated to open in Building C, next to Building B, or in a building in Phase II of the Shopping Center.  (*Id.*; Lease § 1.4(c).)

At the time of the lease agreement, the Shopping Center had not yet been constructed.  Thus, the lease provided certain provisions concerning the construction process and the future tenants of the Shopping Center.  Two of these provisions are pertinent here:  (1) section 1.3 preserving Smokey Point's right to modify the configuration and location of buildings within the Shopping Center; and (2) section 1.6 guaranteeing that certain co-tenants would be operating at the time DSG opened for business.  (*See generally* MTD; Resp. (Dkt. # 20).)

   1. <u>Section 1.3: Right to Alter Buildings</u>

Section 1.3 of the lease provides that Smokey Point has the right to make changes to any of the Shopping Center buildings that are identified on the Lease Plan.  (Lease § 1.3.)  The provision in full reads:

//

> [Smokey Point] reserves the right to alter the Common Areas[3] and to construct any and all improvements including, without limitation, buildings on the Common Areas as it determines and to make changes to any of the Shopping Center Buildings identified on the Lease Plan, including changes in configuration and/or location provided any such changes shall not adversely affect the business operations of [DSG] . . . ; notwithstanding the foregoing, the initial construction of the Shopping Center shall be substantially as shown on the Lease Plan . . . attached hereto as <u>Exhibit A</u>.

(*Id.*) Thus, § 1.3 allowed Smokey Point to change the configuration or location of the buildings on the Lease Plan as long as the changes do not adversely affect DSG's business or render the Shopping Center substantially different from how it appears in the attached Lease Plan.

2. <u>Section 1.6: Initial Co-Tenancy Requirement</u>

The lease also included an Initial Co-Tenancy Requirement, which sought to ensure that the Shopping Center will receive sufficient consumer traffic. (*Id.* § 1.6.) Specifically, § 1.6 sets forth two requirements that must be fulfilled by the time DSG began its tenancy. First, certain identified inducement tenants[4] must be open and operating in their designated spaces, as shown on the Lease Plan. (*Id.* § 1.6(a).) Second, 70% of the remaining leasable area within the Shopping Center must be open and

//

//

//

---

[3] "Common Areas" are areas designed for the benefit of all tenants and occupants, such as the parking lot, the entrances and exits of the Shopping Center, and sidewalks. (Lease § 1.3.)

[4] Inducement tenants are other identified retail stores operating in the Shopping Center so that, as a whole, customers will be attracted to the complex. The inclusion of inducement tenants in a lease serves to assuage any fears a tenant may have about the lack of customers or insufficient traffic to the complex in general. (*See* Resp. at 2.)

functioning as "Required Tenants,"[5] as defined by the lease. (*Id.*) In full, the provision provides:

> [O]n the Rental Commencement Date: (i) Fitness Evolution; (ii) Party City; and (iii) Ulta or an Acceptable Replacement Tenant for Ulta, shall each be open or will simultaneously open with [DSG], fully staffed, stocked and operated as a retail business in substantially all of their respective premises as shown on the Lease Plan . . . [and] at least seventy percent (70%) of the remaining LFA[6] of Phase 1 of the Shopping Center and any LFA constructed within Phase 2 of the Shopping Center, excluding the LFA of the Demised Premises, the Inducement Tenants, and any out-parcels, shall be open or will simultaneously be open with Tenant, fully staffed stocked and operated by Occupants in substantially all of their premises, for the operation of retail businesses by Required Tenants.

(*Id.*) DSG's motion to dismiss concerns only the first requirement. (*See* MTD at 3, 5 n.2.)

If either of the two requirements were not met, the lease allows DSG to either delay its opening, or go forward with opening at a "Substitute Rent . . . in lieu of Rent." (Lease § 1.6(b).) In other words, if the Initial Co-Tenancy Requirement is unfulfilled, then DSG is not obligated to pay full rent to Smokey Point.

**B.  Conduct After Lease Agreement**

At some point after the parties executed lease agreement, Smokey Point reconfigured the Lease Plan—specifically the buildings in Phase I where DSG was to be located. (FAC ¶ 10.) This reconfiguration decreased the overall size of the buildings

---

[5] "Required Tenants" are tenants that meet certain qualifications spelled out by § 1.6 of the lease agreement. (Lease § 1.6(a).) Because DSG's motion to dismiss does not concern this term (*see* MTD at 3, 5 n.2), the court does not provide the full definition here.

[6] "LFA" is the leasable floor area, or the area of the Shopping Center that is intended for exclusive use by a tenant. (*See* Lease § 1.2(d).)

containing the three inducement tenants Party City, Ulta, and Fitness Evolution. (*Id.*) Moreover, Smokey Point allowed another tenant, Tuesday Morning, to share a portion of Building C with Fitness Evolution. (*Id.* ¶ 16.) The three inducement tenants opened in all of the allotted space under this reconfigured plan. (*Id.* ¶¶ 13-17.) Because all three inducement tenants were fully staffed, stocked, and operational in substantially all of their respective premises by March 20, 2017, Smokey Point alleges that it met the Initial Co-Tenancy Requirement on March 21, 2017. (*Id.* ¶¶ 12-17.)

DSG believes that Smokey Point's changes to the Lease Plan constituted a failure to fulfill the Initial Co-Tenancy Requirement. (*Id.* ¶ 21.) Accordingly, DSG has exercised its option to pay a lower substitute rent instead of full rent. (*Id.* ¶ 24.)

Smokey Point brought suit in Snohomish County Superior Court and alleged two causes of action. (*See id.* ¶¶ 25-35.) First, Smokey Point seeks a declaratory judgment that it has complied with its obligations under the Initial Co-Tenancy Requirement, thus entitling it to full rent from DSG since March 21, 2017. (*Id.* ¶ 29.) Second, Smokey Point alleges that DSG breached the terms of the lease agreement by paying a fraction of the rent owed; to date, Smokey Point alleges that DSG owes approximately $153,452.00 in back rent. (*Id.* ¶ 33.) Smokey Point seeks damages, including the back rent as well as any rent that accrues after the filing of the lawsuit. (*Id.* ¶ 2.)[7] DSG removed the action to federal court. (Not. of Rem. (Dkt. # 1).)

//

---

[7] The amended complaint restarts its numbering at the "Relief Requested" section. (*See* FAC at 6, ¶¶ 1-4.) To be clear, the court cites to ¶ 2 on page 6 of the amended complaint.

## III. ANALYSIS

DSG moves to dismiss Smokey Point's claims under Federal Rule of Civil Procedure 12(b)(6). (*See* MTD at 1.) DSG argues that because Smokey Point reduced the size of the inducement tenants' premises, the inducement tenants are not operating in the premises as shown on the Lease Plan attached to the lease. (*Id.* at 12.) Thus, DSG maintains that Smokey Point has not fulfilled the Initial Co-Tenancy Requirement in § 1.6, which requires the inducement tenants to be operational in the premises "as shown on the Lease Plan." (*Id.*) DSG maintains that Smokey Point's right to alter the Shopping Center, as guaranteed by § 1.3, has no bearing on the fulfillment of § 1.6. (*Id.* at 7-10.) Accordingly, DSG claims that it is entitled to pay substitute rent, thus defeating both Smokey Point's declaratory judgment and breach of contract claims. (*Id.*) The court now addresses DSG's motion.

### A. Legal Standard

Dismissal for failure to state a claim "is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (internal quotation marks omitted). However, "[i]t is well established that questions of fact cannot be resolved or determined on a motion to dismiss for failure to state a claim upon which relief can be granted." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir. 1990); *see also Ramgen Power Sys. LLC v. Agilis Eng'g Inc.*, No. C12-1762MJP, 2013 WL 12120456, at *2 (W.D. Wash. Apr. 23, 2013) (finding a question of fact to be "an inappropriate subject for a Fed. R. Civ. P. 12(b)(6) dismissal").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Mere conclusory statements" or "formulaic recitation[s] of the elements of a cause of action," however, "are not entitled to the presumption of truth." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (citing *Twombly*, 550 U.S. at 555).

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court construes the complaint in the light most favorable to the nonmoving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). On a motion to dismiss, the court may consider the pleadings, documents attached to the pleadings, documents incorporated by reference in the pleadings, or matters of judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citing *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002)).

Generally, "a plaintiff's burden at the pleading stage is relatively light." *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. C13-0674RSM, 2013 WL 4721812, at *1 (W.D.

Wash. Sept. 3, 2013). "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

**B.    DSG's Motion to Dismiss**

This dispute boils down to the interpretation of the phrase "as shown on the Lease Plan" in § 1.6 of the lease agreement. The parties fundamentally disagree over whether this "Lease Plan" refers to the exact version of the Lease Plan that was attached as Exhibit A at the time of signing, or to an iteration of the Lease Plan after Smokey Point exercised its right under § 1.3 to alter the configuration or location of the buildings. (*See* Lease § 1.6.) DSG argues that the "Lease Plan" in § 1.6 is wholly separate from any right to alter in § 1.3, and thus the "Lease Plan" refers only to the Exhibit A version. (MTD at 7-9.) In other words, DSG posits that once Smokey Point made changes to the Shopping Center that deviated from what was shown in Exhibit A, Smokey Point failed to meet its initial co-tenancy requirement. (*See id.* at 10-11.) Smokey Point disputes this interpretation of § 1.6, contending that § 1.3 allows Smokey Point to alter the Lease Plan and still comply with the initial co-tenancy requirement. (Resp. at 7-10.) Thus, Smokey Point asserts that it met the initial co-tenancy requirement by having all inducement tenants operating in "substantially all of their respective premises under the Lease Plan reconfigured pursuant to Section 1.3." (*Id.* at 10.)

//

Washington law governs the issue of contract interpretation. *See Kent 160 LLC v. City of Auburn*, No. C09-1670RSL, 2010 WL 1691870, at *2 (W.D. Wash. Apr. 26, 2010). Under Washington law, the goal of contract interpretation is to determine the intent of the parties. *Deep Water Brewing v. Fairway Res. Ltd.,* 215 P.3d 990, 1001 (Wash. Ct. App. 2009). To do so, courts follow the "objective manifestation theory of contracts" by determining the intent of the parties from the reasonable meaning of the words of the contract. *GMAC v. Everett Chevrolet, Inc.*, 317 P.3d 1074, 1078 (Wash. Ct. App. 2014); *see also Hearst Commc'ns Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005) (directing courts to "impute an intention corresponding to the reasonable meaning of the words used"). However, if two reasonable and fair interpretations of the contract language are possible, the contract is ambiguous. *State Farm Gen. Ins. Co. v. Emerson*, 687 P.2d 1139, 1144 (Wash. 1984). Such an ambiguity presents a question of fact that cannot be determined as a legal matter. *See GMAC*, 317 P.3d at 1078; *Tanner Elec. Coop. v. Puget Sound Power & Light*, 911 P.2d 1301, 1310 (Wash. 1996). Because questions of fact cannot be resolved at the motion to dismiss stage, a contract that presents an ambiguity cannot be dismissed on a Rule 12(b)(6) motion. *See Cook*, 911 F.2d at 245; *Ramgen*, 2013 WL 12120456, at *2. In other words, to prevail, DSG must show that there is only one reasonable interpretation of § 1.6, and that interpretation favors DSG's position.

The court finds that the language in § 1.6, "as shown on the Lease Plan," is subject to more than one reasonable interpretation. Instead, at this early stage—in which the court cannot consider extrinsic evidence such as the circumstances surrounding the

making of a contract, the subsequent conduct of the parties, preliminary negotiations, and the course of dealing between the parties—the court finds that both DSG and Smokey Point's proposals are reasonable interpretations of the "Lease Plan" referred to in § 1.6.

First, nothing in § 1.6 itself suggests one way or the other whether the referenced "Lease Plan" had to be the exact version attached as Exhibit A. In other words, § 1.6's plain language could be read to support either DSG's interpretation—that the "Lease Plan" must be the version memorialized as Exhibit A—or Smokey Point's interpretation—that the "Lease Plan" simply refers to a version of the Lease Plan. Indeed, read in conjunction with § 1.3's reservation of the right to alter, it is reasonable to believe that parties may have anticipated the Lease Plan changing. And unlike § 1.3, where the language explicitly states that § 1.3 refers to the Lease Plan "attached hereto as Exhibit A" (*see* Lease § 1.3), § 1.6 does not feature any such express tethering (*see id.* § 1.6). This absence of an explicit reference to Exhibit A further amplifies the ambiguity of the "Lease Plan" in § 1.6.

Second, read in light of the entire contract, both parties' interpretations are reasonable at this stage of the proceedings. Because the lease agreement was signed before construction began, the contract in several places contemplated the possibility of change. For instance, exhibit C-1 detailed the finalization process for the construction of DSG's store and contemplated that the parties would "subsequently agree upon more particularized specifications." (Thoreson Decl. ¶ 2, Ex. A. at 9.) And indeed, as Smokey Point contends, requiring compliance with a preliminary site plan at such an early stage of construction, before requirements such as permits were secured, may well produce a

commercially absurd result. (*See* Resp. at 9-10); *Wash. Pub. Util. Dist. Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam Cty.*, 771 P.2d 701, 707 (Wash. 1989) (discouraging contract interpretations that would lead to an absurd conclusion or render the contract nonsensical or ineffective). Of course, this is not to say that such a result could not have been what the parties intended; it is possible extrinsic evidence may reveal that, as DSG argues, both parties intended for the preliminary Lease Plan attached as Exhibit A to control. (*See* MTD at 12; Reply at 3.) But, the court lacks the necessary information at this stage to make that determination one way or the other. Because the language is susceptible to two reasonable interpretations, creating a question of fact that the court cannot resolve at the motion to dismiss stage, the court denies DSG's 12(b)(6) motion.

DSG raises several arguments against the applicability of § 1.3, none of which are meritorious. First, DSG contends that the right to alter in § 1.3 arises only after the initial construction of the Shopping Center. (MTD at 7.) But this contention mischaracterizes the language of § 1.3. DSG summarily relies on the requirement in § 1.3 that "the initial construction of the Shopping Center shall be substantially as shown on the Lease Plan . . . attached hereto as <u>Exhibit A</u>." (*Id.* at 8.) But this limitation does not mean that Smokey Point could not make any alterations before the initial construction; instead, the plain language simply requires that any alterations made before the initial construction not be so drastic that the Shopping Center no longer "substantially" adheres to what is shown in the attached Lease Plan. In other words, the language in § 1.3 allows for pre-initial construction changes but merely limits the scope of those changes. Adopting

//

1 | DSG's interpretation would read out the word "substantially" from the provision. The
2 | court declines to do so. *See Wagner v. Wagner*, 621 P.2d 1279, 1283 (Wash. 1980).

DSG next maintains that § 1.3 has no impact on § 1.6, as evidenced by the fact that the sections do not reference each other. (MTD at 8-9.) But the absence of an explicit reference is not dispositive. First, the contract must be construed in its entirety in order to give effect to each clause, and thus, when interpreting § 1.6, the court should take § 1.3 into account. *See Wash. Pub. Util.*, 771 P.2d at 707. Moreover, although the sections do not refer to each other, they both utilize the same terms, such as the "Lease Plan." *See McLane & McLane v. Prudential Ins. Co. of Am.*, 735 F.2d 1194, 1195-96 (9th Cir. 1984) ("We may presume that words have the same meaning through the contract."); 4 S. Williston, *A Treatise on the Law of Contracts* § 618, at 715-16 (3d ed. 1961). Thus, the lack of reference from one section to the other does not conclusively determine that DSG's reading of § 1.6 is the only reasonable interpretation.

Lastly, DSG maintains that interpreting § 1.3 to allow Smokey Point to alter the Lease Plan referenced to in § 1.6 would "render the phrase 'as shown on the Lease Plan' [in § 1.6] meaningless." MTD at 10. But even if the "Lease Plan" referenced in § 1.6 is a later iteration of the Lease Plan, the phrase still ensures that upon execution of the plan, the inducement tenants will operate largely as the Lease Plan depicts. In other words, the phrase holds just as much meaning as it would if it referred only to Exhibit A: to provide that the actual construction process adheres to the Lease Plan's layout, whether that is the

//

//

version represented in Exhibit A or some later version reflecting a change Smokey Point made pursuant to § 1.3.[8]

Even if the court agrees with DSG's interpretation and finds that "as shown on the Lease Plan" must be read to refer to the version memorialized as Exhibit A, DSG still could not prevail at this stage because of the ambiguity surrounding the term "substantially." Section 1.6 requires the inducement tenants to operate in "substantially all of their respective premises as shown on the Lease Plan." (Lease § 1.6.) Thus, even if the Lease Plan were the one depicted in Exhibit A, Smokey Point could still fulfill its initial tenancy requirement if the changes it made did not "substantially" change the inducement tenants' premises.[9] The scope of the change allowed thus depends on how much leeway is contemplated by the term "substantially."

//

//

---

[8] For the first time on reply, DSG points to § 17.19 in the lease agreement and argues that Smokey Point may not amend any part of the contract, including the Lease Plan, without a written agreement between the parties. (Reply (Dkt. # 22) at 5; *see generally* MTD.) The court "need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). Even if the court were to consider this new argument, DSG's contention is unpersuasive. DSG claims that § 1.3 does not allow Smokey Point to alter the Lease Plan itself but only the buildings identified on the Lease Plan. (Reply at 6.) Thus, DSG maintains that § 1.3 does not authorize Smokey Point to "shrink the spaces occupied by the [i]nducement [t]enants." (*Id.*) But that distinction is without a difference. If Smokey Point is authorized by § 1.3 to change the "configuration and/or location" of the buildings (Lease § 1.3), it certainly has the authority to alter the inducement tenants' spaces, which are located within the buildings (*see* Lease Plan).

[9] Thus, contrary to DSG's representation, Smokey Point does not "admit[] that it has not met the Initial Co-Tenancy Requirement" by "acknowledg[ing] that it shrank the spaces occupied by the [i]nducement [t]enants." (*See* MTD at 12.) Indeed, Smokey Point could have reduced the applicable spaces but still fulfilled the Initial Co-Tenancy Requirement if the reduced spaces remained "substantially" as shown on the Lease Plan. (*See* Lease § 1.6.)

DSG and Smokey Point differ in their interpretations of what "substantially" means. DSG contends that the term means "essentially" the same and thus allows for little to no leeway in terms of how much deviation is allowed. (Reply at 7-8.) In contrast, Smokey Point argues for more room to deviate because "substantially" means "largely . . . that which is specified," or "[f]or the most part." (Resp. at 8-9.) Because the lease agreement does not define "substantially," and both definitions are reasonable interpretations, the court concludes that the term is ambiguous. Thus, whether Smokey Point's reconfiguration of the Lease Plan nonetheless allowed the inducement tenants to occupy "substantially all of their respective premises" is an open question of fact that the court cannot answer at this stage.[10]

Given the ambiguities surrounding the language "as shown on the Lease Plan" and "substantially," it is inappropriate on this record for the court to dismiss Smokey Point's allegations. At this time, the court does not determine—and lacks the information to determine—whether Smokey Point's reconfiguration of the inducement tenants' spaces complied with the Initial Co-Tenancy Requirement in § 1.6.

//

//

//

---

[10] DSG alleges that Smokey Point makes only a conclusory assertion that it met its initial co-tenancy requirement. (MTD at 11-12.) This assertion is inaccurate. The operative complaint lists when each inducement tenant began operations in its allotted space under the reconfigured plan (FAC ¶¶ 13-15), describes the opening of an additional tenant in the building with one of the inducement tenants (*id.* ¶ 16), and spells out the Required Tenants that are purported to occupy at least 81% of the remaining leasable floor area (*id.* ¶ 18).

## IV.  CONCLUSION

For the foregoing reasons, the court DENIES DSG's motion to dismiss (Dkt. # 15).

Dated this 27th day of October, 2017.

JAMES L. ROBART
United States District Judge